UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADALBERTO RIVERA PAVÓN, ADALBERTO RIVERA CRUZ, and BILLY EDGARDO RIVERA CRUZ,<br><br>    Plaintiffs,<br><br>v.<br><br>LIBRE BY NEXUS INC.,<br><br>    Defendant. | Case No.___-cv-___<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Adalberto Rivera Pavón, Adalberto Rivera Cruz, and Billy Edgardo Rivera Cruz, through their counsel, allege upon personal knowledge as to themselves and information and belief as to other matters, as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiffs bring this action to challenge the illegal and predatory practice of Defendant Libre By Nexus ("**LBN**") of extracting exorbitant fees from individuals released on bond from immigration detention. Plaintiffs seek monetary damages for the nearly $30,000 they paid to LBN, and for the emotional pain and suffering they experienced as a result of LBN's exploitation.

2.    The United States detains hundreds of thousands of immigrants each year. Many of those detained individuals, such as Plaintiffs, are asylum seekers who are detained soon after arriving in the United States. Asylum seekers who establish a credible fear of return to their home country, as the Plaintiffs established, may be eligible to be released on bond.

3. Many individuals cannot afford to pay their bond amounts, which are often thousands of dollars per person. While there are bond companies and organizations that will post bond for a reasonable fee or will provide other assistance, many individuals in detention do not know about their services.

4. LBN's business model depends on exploiting these detained individuals who cannot afford to pay their bonds outright or are unaware of alternative ways to pay their bond. LBN advertises heavily in detention centers, sometimes even paying detainees to refer other individuals to LBN, and convinces the families of those detained individuals to pay significant amounts of money in the hope that their loved ones will be released.

5. However, when convincing family members to pay the upfront fees, LBN fails to disclose material facts about what conditions are required upon release, and LBN then discloses the additional terms only at the point when the detainees are in LBN's custody and feel they have no other choice than to sign the contract and comply with LBN's terms.

6. Once LBN obtains thousands of dollars from the detained individuals' families—much of which is for unidentified service fees and other costs unrelated to the bond—LBN transports the individuals hundreds of miles from the detention center to an LBN office. After getting the individuals to sign various contracts and documents (almost all of which are written strictly in English), LBN representatives snap bulky GPS ankle monitors on the released individuals. The representatives tell the individuals that they are now required to wear the monitor at all times and must pay LBN $420 per month to "lease" it until they either pay 80% of the bond (in addition to the monthly payments) or their immigration case is terminated, which can take years. The representatives then drop the individuals at a bus station and leave.

7. Additionally, LBN informs the individuals that if they stop making the monthly payments, LBN could have them re-detained. As such, individuals are coerced into paying LBN far more than the original amount of the bond in an effort to remain free, to be able to care for their families, and out of fear of damaging their pending asylum applications.

8. Even when individuals make timely payments, LBN still harasses them for money, calling them repeatedly, day and night.

9. In short, LBN operates a sophisticated bait-and-switch scheme that preys upon detained individuals and their families at a time when they are most vulnerable. LBN has reaped millions of dollars in profits at the expense of these individuals.[1]

10. LBN's treatment of Plaintiffs perfectly illustrates how this scheme can trap a family into paying LBN exorbitant amounts of money out of fear that LBN could have them re-detained. Plaintiffs now seek to rectify these wrongs.

## **PARTIES**

11. Plaintiff Adalberto Rivera Pavón ("**Adalberto**") is an individual who resides in Richmond County, New York. Adalberto was 49 years old at the time he sought asylum in the United States.

12. Plaintiff Adalberto Rivera Cruz ("**Beto**") is an individual who resides in Richmond County, New York. Beto was 19 years old at the time he sought asylum in the United States.

---

[1] *See, e.g.*, Michael E. Miller, *This company is making millions from America's broken immigration system*, Wash. Post (Mar. 9, 2017), https://www.washingtonpost.com/local/this-company-is-making-millions-from-americas-broken-immigration-system/2017/03/08/43abce9e-f881-11e6-be05-1a3817ac21a5_story.html?noredirect=on&utm_term=.1228d7d2b1e5.

13. Plaintiff Billy Edgardo Rivera Cruz ("**Billy**") is an individual who resides in Richmond County, New York. Billy was 18 years old at the time he sought asylum in the United States.

14. Defendant LBN is a corporation headquartered and incorporated in the state of Virginia, with its principal place of business in Verona, Virginia.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

16. This Court has personal jurisdiction over Defendant because Defendant has conducted a substantial amount of the conduct complained of within this district, and because Defendant transacts business in this district.

17. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391 because the Defendant transacts business in this district and a substantial amount the conduct complained of occurred within this district.

## FACTUAL ALLEGATIONS

18. Plaintiff Adalberto Rivera, along with his wife Xiomara Yamileth Cruz Hernandez ("**Xiomara**"), and their three children, Plaintiff Beto Rivera, Plaintiff Billy Rivera, and Darling Rivera Cruz ("**Darling**"), came to the United States in December 2015, fearing for their lives if they remained in their home country of Honduras. They traveled for a month, often in dangerous situations, in order to seek asylum in the United States.

19. The family fled Honduras as a result of being threatened by an organized criminal network. The family also feared for their safety when the three Rivera sons became targets for

gang recruitment. The family was in imminent danger after Adalberto and his niece witnessed the murder of Adalberto's brother-in-law. After providing statements to the police about the murder they witnessed, Adalberto's niece was herself murdered. The family received death threats, and, fearing for their lives, made the difficult decision to leave Honduras and flee to the United States to seek asylum. In 2017, the family was granted asylum in the United States.

20. In November 2015, the family left Honduras and traveled through Guatemala and Mexico. On December 1, 2015, the family crossed the U.S. border in California, and turned themselves in to the United States Customs and Border Protection ("**CBP**") to seek asylum.

21. CBP turned over custody of the family to Immigration and Customs Enforcement ("**ICE**"). Once in custody, Plaintiffs were separated from Xiomara and Darling, who was a minor at that time.

22. Xiomara and Darling were separated from each other for four days, at which point they were released on the condition that Xiomara wear an ankle monitor provided by ICE. Xiomara was not required to pay for that device.

23. After Xiomara and Darling were released from custody, they traveled to New York City, where they currently reside.

24. Plaintiffs Adalberto, Beto, and Billy were also taken into custody, and were transferred among detention facilities before ultimately being detained at Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("**Pine Prairie**").

25. Plaintiffs remained at Pine Prairie for approximately two and a half months.

26. The government determined that Plaintiffs had sufficiently established that they had a credible fear of being returned to Honduras, which allowed an immigration judge to determine whether to release them subject to a bond.

27. At Pine Prairie, the three men each were brought before the same Immigration Judge, where Adalberto argued for himself and his sons. The Judge set a bond amount for each at $7,500.

28. However, Adalberto, Beto, and Billy were unable to afford the combined amounts of their bonds ($22,500) because they had used all of their savings to travel from Honduras, and had no assets in the United States.

**Initial Contacts with LBN**

29. Plaintiffs first heard of LBN at Pine Prairie because LBN was advertised on a closed-circuit television system at the detention center.

30. LBN's advertisements portrayed its mission as helping immigrants with limited resources get released from immigration detention.

31. Upon information and belief, LBN paid detained immigrants to recruit others to sign up for its programs. For example, Adalberto was offered money in exchange for referring individuals to LBN.

32. After learning about LBN's services, Adalberto gave his wife, Xiomara, LBN's phone number and asked her to call LBN and inquire about their services.

33. Xiomara called the number and spoke with an LBN employee in Virginia named Sonia.

34. Sonia informed Xiomara that the process for getting Adalberto, Beto, and Billy released was very easy. Sonia told Xiomara that in order for LBN to help get her husband and sons out of detention, she would need to pay 20% of each of their bonds up front to LBN, in addition to certain additional fees. Sonia explained that Xiomara would need to pay LBN an approximate upfront total amount of close to $9,000, and noted that the upfront amount was not

refundable. Xiomara asked Sonia why the process was so expensive, and Sonia replied that the total fee included taxi and bus fares, food, and travel costs for Plaintiffs to travel to New York, but did not provide more detail.

35. Xiomara explained that she did not have $9,000, and Sonia replied that Xiomara should contact her when she had the money available.

36. Neither Sonia nor any other LBN employee informed Xiomara that LBN would require Plaintiffs to wear ankle monitors if they were released using LBN's services, or that they would have to pay $420 per month to lease the monitors.

37. At the end of February 2016, the immigration judge who had set Plaintiffs' bonds told Adalberto that unless Plaintiffs paid their bonds, he would rescind the bonds and they would likely be deported within fifteen days. As a result, the family began to desperately search for alternatives to pay the bonds to prevent Plaintiffs from being further separated from Xiomara and Darling and being sent back to Honduras, where they feared for their lives.

38. Adalberto called Xiomara to let her know what the immigration judge had told him. He asked her to call his son from a previous relationship, Jorge Adalberto Rivera Parada ("**Jorge**"), who lived in California, to explore whether Jorge could pay the upfront amount LBN required.

39. Xiomara called Jorge and explained that Adalberto, Beto, and Billy would be deported in fifteen days if they could not pay their bonds. Jorge agreed to do everything in his power to gather the money to pay LBN. Jorge, Xiomara, and Plaintiffs understood that if Jorge was able to gather the money to pay LBN, Plaintiffs would repay him that amount after they were released.

40. Jorge was able to borrow money from a friend to pay LBN to release his father and

7

brothers.

41. Jorge contacted Sonia, and ultimately paid over $7,000 to LBN so that his relatives could be released.

42. Plaintiffs have since repaid Jorge the full amount that Jorge paid to LBN.

43. After Jorge made the upfront and non-refundable payment, LBN agreed to arrange for Adalberto, Beto, and Billy's release from detention and for their travel to New York.

44. Apart from an initial call Adalberto made to LBN, LBN had no direct communication with Plaintiffs before arranging for their release from detention. Accordingly, prior to their release, LBN did not explain the terms of their services nor provide the contracts that they would ultimately require Plaintiffs to sign once they had been released.

45. It was not until Plaintiffs were called from their cells at Pine Prairie that they found out that they were being released into LBN's custody.

46. Their releases happened over the course of two days. First, on March 3, 2016, Adalberto and Billy were released at the same time, at around 2 or 3 PM. The two men were told that because LBN had made an error in the paperwork, Beto would be released at a later time. Beto was released on March 4, 2016.

**Adalberto and Billy's Release from Detention**

47. Adalberto and Billy, as well as a third unrelated detainee, were directed to a waiting cab, and driven to a Walmart parking lot. At the Walmart parking lot, they were met by an LBN representative named Brian. Brian began driving them to Houston. After several hours on the road, Brian stopped and took the men to McDonald's for dinner, and then drove again for hours until they reached LBN's office in Houston, Texas later that evening.

48. Brian and one other employee were at the LBN office when Adalberto and Billy

8

arrived. Brian placed pages of LBN contracts in front of each man for them to sign. Apart from a one-page document in Spanish that did not include key information, the contracts were in English, which neither Adalberto nor Billy could read. *See* Exs. A & B.

49. Upon information and belief, Brian signed the contracts on behalf of LBN as Brian Perlman. Although both LBN employees spoke Spanish, they did not translate the documents for Adalberto and Billy.

50. Adalberto and Billy signed the contracts because they believed that they had no other choice, especially since Jorge had already paid over $7,000 to LBN.

51. After the contracts were signed, Brian placed ankle monitors on Adalberto and Billy, explaining for the first time that they would be responsible for wearing the devices at all times and for charging them several hours each night. Neither Adalberto nor Billy knew that this would be a requirement before signing the contracts or before Brian placed the monitors on their ankles.

52. Moreover, neither Brian nor the other LBN employee explained to Adalberto and Billy that LBN required that they each pay $420 per month as a fee for leasing the ankle monitors.

53. Brian informed them that they would have to continue to wear the ankle monitors until their case was complete.[2]

54. Around 3:00 AM on March 4, 2016, Adalberto and Billy left LBN's Houston office and were taken to a bus station, where they boarded a bus from Houston to New York City. LBN paid for the bus tickets, and Adalberto and Billy were given $60 to pay for food.

---

[2] In fiscal year 2016, cases in immigration court took an average of 672 days, or 22.4 months, to be processed. *See* TRAC Reports, Immigration Court Backlog Tool (November 1, 2018) https://trac.syr.edu/phptools/immigration/court_backlog/. LBN charges $14 per day to wear the ankle monitor. As such, individuals unable to pay LBN their bond amount would incur, on average, more than $9,400 in fees owed to LBN.

## Beto's Release from Detention

55. Beto was released from Pine Prairie on March 4, 2016, a day after his father and brother, at about 2:00 PM. Similar to Adalberto and Billy, Beto was released from ICE custody and directed to a waiting taxi cab, which drove him to a shopping center parking lot. In the parking lot, Beto met Wendy, an LBN representative who drove him to LBN's Houston office. During the drive to Houston, Wendy picked up two other detainees.

56. During the drive, Wendy stopped at McDonald's where she purchased food from the value menu for the three men.

57. Beto arrived at LBN's Houston office around 7:30 PM on March 4, 2016, and was kept there until around 1:00 AM on March 5, 2016. Wendy, who was not proficient in Spanish, instructed Beto to sign an English language contract, which Beto could not read. She did not translate the contract for him. *See* Ex. C.

58. After Beto signed the contract, Wendy placed an ankle monitor on his ankle, and told him that he was required to pay LBN $420 per month to lease it. Beto was surprised by this requirement because he had not been told that he would have to lease an ankle monitor either before his release or before signing the contract.

59. Beto felt as if he was back in detention. However, he felt like he had no other choice but to acquiesce, since he had already signed the documents and because Jorge had already paid LBN a significant amount of money.

60. Around 1:00 AM on March 5, 2016, Beto left LBN's Houston office and was taken to a bus station, where he boarded a bus from Houston to New York City. Beto was given a flip phone, which he used to call his mother in New York. As with Adalberto and Billy, LBN paid for Beto's bus ticket and gave him $60 to pay for food.

### LBN's Contract Terms

61. LBN advertises itself as a company that facilitates the release of immigrant detainees by providing collateral to registered bond companies, which in turn agree to sign the detainees' bonds to secure their release from detention.

62. The contracts LBN required Plaintiffs to sign were more than 20 pages long (collectively, the "**LBN Contracts**" and each, an "**LBN Contract**"). The only document provided to Plaintiffs in Spanish was a single page that purported to be a summary of the terms of the contract (the "**Summary**"). The Summary does not accurately or adequately disclose the terms of the LBN Contracts, omitting many highly material terms of the LBN Contracts. For example, the Summary does not state that an ankle monitor will be required for an open-ended period of time. It does not disclose the cost of its use or give any indication that money paid by the detainee will be applied to such costs, rather than towards a reduction of the outstanding bond. Moreover, it does not state that Plaintiffs would be required to pay a monthly fee of $420 to lease the ankle monitor. *See* Exs. A, B & C.

63. The terms of the LBN Contracts in English are also materially different from the terms LBN leads detained immigrants and their families to expect prior to the immigrant's release.

64. In fact, Plaintiffs were not aware of the ankle monitor fees and requirements until after they signed the LBN Contracts and after LBN representatives placed the monitors on their ankles.

65. Upon information and belief, LBN fails to provide adequately translated documents to all of its clients, and its treatment of Plaintiffs is not an isolated instance of misconduct.

66. Upon information and belief, while at LBN's offices in Houston, the other recently released detainees were treated in the same manner as Plaintiffs, and were not given full or

accurate information about the contracts that they were signing.

67. Plaintiffs did not feel that they could contest, challenge, or renegotiate the terms of the LBN Contracts.

68. Plaintiffs were unaware of the full terms of the LBN Contracts until they obtained legal representation in New York City.

### **LBN's Aggressive Fee Collection Practices**

69. When Plaintiffs arrived in New York City in March 2016, they rejoined Xiomara and Darling, and the family began living in the living room of an acquaintance's apartment in the Bronx. In April 2016, the family moved from the Bronx to Staten Island, NY.

70. Shortly after arriving in New York City, Plaintiffs began paying the exorbitant monthly ankle-monitor leasing fees to LBN. Each month, the family paid LBN $1,260 ($420 per month for each Plaintiff). The family kept a record of the payments they made.

71. Because the family feared that LBN would otherwise send Plaintiffs back into detention if they failed to make the monthly payments, which they feared would damage their pending asylum applications, they continued to pay the monthly ankle monitor lease fees until their asylum claims were granted in the fall of 2017.

72. Even though Plaintiffs paid LBN each month, LBN began to harass Plaintiffs and their family for payments. LBN representatives would call Xiomara directly multiple times during the day and night. These repeated and harassing calls—especially ones made in the middle of the night—further intimidated the family.

73. In an effort to protect themselves from LBN's repeated and false accusations that they were behind on their payments, Xiomara insisted on getting receipts from LBN in the hope that the payment confirmations would help to prevent the harassment.

74. However, even though Xiomara would send pictures of the receipts by text to the LBN workers who called her, her actions did not stop LBN from continuing to harass Plaintiffs, demanding payment.

75. Plaintiffs continued to make payments to LBN until they were granted asylum in November 2017.

76. From May 2016 until October 2017, Plaintiffs paid LBN over $21,000 in monthly ankle-monitor rental fees. Upon information and belief, the fees LBN charges as rental payments for the ankle monitors has no relationship to and significantly surpasses the actual monetary value of the monitors.

77. In addition to the payments for leasing the ankle monitors, Plaintiffs repaid Jorge for the over $7,000 he lent to Plaintiffs to help them be released from detention.

78. In total, Plaintiffs paid LBN nearly $30,000. If Plaintiffs had paid their bonds outright and not gone through LBN, they would have paid a total of $22,500 for the bonds, thousands less than the amount they ended up paying to LBN. Moreover, had they paid their bonds outright, they would have received full reimbursement of the bond cost once they received asylum.

**Plaintiffs' Experiences Wearing Ankle Monitors**

79. About eight months after arriving in New York City, Beto was stopped by a New York City police officer, who noticed the heavy monitor on his ankle. When Beto explained that LBN required him to wear it as a condition of his release, the office told him that private companies were not allowed to require individuals to use ankle monitors, and cut it off him.

80. However, because Beto was frightened that LBN would discover that his ankle monitor had been cut, and that they would send him back to detention as punishment, Beto kept

the ankle monitor with him in his backpack at all times.

81. Beto was humiliated by wearing the ankle monitor, and it made him feel as if he was still in detention. He worried that people thought he was a criminal because he was wearing an ankle monitor.

82. Sometime later, Billy's monitor fell off during a game of soccer. Like his brother, Billy remained frightened that if LBN found out that he was not wearing the monitor, immigration officials would pick him up and it would harm his asylum application. He also carried the monitor with him in a backpack.

83. Billy was humiliated about wearing the ankle monitor because others assumed that he had committed a crime.

84. Adalberto kept his ankle monitor on the longest. However, because of its extreme discomfort, he also ended up removing it.

85. Adalberto was also humiliated about wearing the ankle monitor.

86. Plaintiffs continued to charge their ankle monitors after they were no longer physically wearing them.

87. All three Plaintiffs found the ankle monitors very uncomfortable. At their jobs, which required that the men wear boots to protect their feet from heavy machinery, the large size of the ankle monitor made wearing boots nearly impossible, and caused them severe pain. The ankle monitors were hot and tight, causing inflammation in their feet, making them swollen and painful.

**Plaintiffs Receive Asylum**

88. Plaintiffs were granted asylum in November 2017. Upon obtaining asylum, Xiomara promptly notified LBN by phone so that Plaintiffs could be released from their contracts.

LBN did not respond.

89. Plaintiffs, Xiomara, and their attorney called LBN repeatedly between November 2017 and March 2018 to try to arrange a time for LBN to collect the ankle monitors and provide Plaintiffs with documentation confirming that they were no longer required to pay the monthly leases.

90. It was not until March 2018 that LBN finally responded. LBN told the family that it would send a representative to Plaintiffs' home to pick up the ankle monitors and to give Plaintiffs paperwork confirming that their immigration bonds were cancelled and that their contracts with LBN were terminated.

91. Plaintiffs informed the LBN representative that LBN should only contact them through their attorney at Legal Services NYC, and that Plaintiffs wanted the GPS monitor exchange to occur at their attorney's office. LBN refused to abide by this request.

92. In March 2018, Plaintiffs' counsel at Legal Services NYC also contacted LBN directly, and were told that LBN would not honor Plaintiffs' request, and would continue to engage with Plaintiffs directly.

93. On March 6, 2018, Plaintiffs' attorney spoke with several LBN representatives, and instructed the LBN representative to come to the attorney's office to collect the ankle monitors and not to go to the Plaintiffs' home. LBN's representative ignored Plaintiffs' attorney's request, and on the evening of March 6, 2018, showed up to Plaintiffs' home and collected the ankle monitors.

94. After the LBN representative stated that he would not collect the ankle bracelets at Plaintiffs' attorney's law office, Plaintiffs' attorney was able to travel to Plaintiffs' home to be present when LBN's representative arrived.

95. LBN's representative expressed anger that Plaintiffs were not wearing the ankle monitors when he arrived, even though Plaintiffs had been granted asylum over five months previously.

96. On information and belief, in retaliation for the fact that Plaintiffs were not wearing the ankle monitors, the LBN representative refused to provide any documentation that Plaintiffs' immigration bonds had been cancelled, which the representative had previously promised to do.

## COUNT I
### Deceptive Acts and Practices
### N.Y. Gen. Bus. Law § 349(h)

97. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 96 as if fully set forth herein.

98. New York General Business Law § 349(a) prohibits deceptive acts or practices in the conduct or furnishing of any business, trade, or commerce in New York State.

99. Defendant engaged in deceptive acts and practices by not informing Plaintiffs of their bond release options, by causing Plaintiffs to arrange for payment of over $7,000 for unidentified fees and costs before presenting Plaintiffs with the English-only LBN Contracts, and by misleading Plaintiffs via the Summary and coercing Plaintiffs at LBN's Houston office into signing the English-only LBN Contracts and paying $420 per month for an indefinite period of time for a GPS ankle monitoring device as a condition of LBN securing their immigration bond.

100. Defendant's actions were performed as part of its regular business practices, and their predatory and coercive behavior affects individuals around the country.

101. Plaintiffs are monolingual Spanish speakers, and Defendant only provided them with the one-page Summary in Spanish, which grossly misrepresented the obligations in the LBN Contracts.

102. As a result of Defendant's misleading and deceptive portrayal of the obligations in the LBN Contracts, Plaintiffs together suffered nearly $30,000 in monetary damages. Additionally, each Plaintiff individually suffered over $100,000 in damages for pain and suffering due to LBN's exploitative and deceptive conduct.

## COUNT II
### Misrepresentation under New York Common Law

103. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 102 as if fully set forth herein.

104. LBN had a duty to fully disclose the material terms of the LBN Contracts to Plaintiffs prior to getting them to sign the contracts.

105. LBN knew that the information it provided to Plaintiffs was misleading, incomplete, and incorrect.

106. Upon information and belief, LBN and its representatives made various factual statements to Plaintiffs, via their communications with Xiomara, which they knew or should have known were false.

107. Upon information and belief, LBN and its representatives made various factual statements directly to Plaintiffs that they knew or should have known were false.

108. LBN made these representations for the purpose of inducing Plaintiffs to enter into the onerous LBN Contracts.

109. Plaintiffs reasonably relied on LBN's representations, and entered into the LBN Contracts, which caused them to suffer nearly $30,000 in monetary damages. Additionally, each Plaintiff individually suffered over $100,000 in damages for pain and suffering due to LBN's exploitative and deceptive conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial on all claims so triable and judgment against Defendant, as follows:

A. Issue a declaratory judgment that LBN's conduct was deceptive and unlawful;

B. Order Defendant to pay actual, compensatory, and punitive damages as allowed by law;

C. Award pre-judgment interest, and post-judgment interest as allowed by law;

D. Award costs and reasonable attorney's fees to Plaintiff's attorneys under N.Y. Gen. Bus. Law § 349(h); and

E. Award such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury in this action.

Dated: March 4, 2019

Respectfully Submitted,

LEGAL SERVICES NYC

/s/ Edward Josephson
Edward Josephson
Anne Nacinovich
Kathryn Ramos (*pro hac vice* forthcoming)
40 Worth Street, Suite 606
New York, NY 10013
Tel.: 646-442-3600
ejosephson@lsnyc.org
anacinovich@lsnyc.org
kramos@lsnyc.org

Robert D. Gordon (*pro hac vice* forthcoming)
Edeli Rivera (*pro hac vice* forthcoming)
Carl Wedoff
JENNER & BLOCK, LLC
919 Third Avenue

New York, NY 10022
Tel.: (212) 891-1600
Fax: (212) 891-1699
rgordon@jenner.com
erivera@jenner.com
cwedoff@jenner.com

*Attorneys for Plaintiffs*